IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KENNETH A DADE,                        )
                    Petitioner,        )       Civil Action No. 04-1343
                                       )
             vs.                       )       Judge Gary L. Lancaster
                                       )       Magistrate Judge Lenihan
DAVID DIGUGLIELMO,                     )
                    Respondent.        )


MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

I.   RECOMMENDATION

     It is respectfully recommended that the Petition for Writ
of Habeas Corpus, as amended, be denied and that a certificate
of appealability be denied.

II.  REPORT

     Petitioner, Kenneth Andre Dade, has filed a Petition for
Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, wherein he
challenges his 1999 convictions for murder in the third degree,
theft by unlawful taking, receiving stolen property, arson,
criminal mischief, firearms not to be carried without a license
and criminal conspiracy.  In his Petition and Amended Petition,
he raises the following claims for relief.

        1.    Illegal confession.

        2.    Trial Counsel was ineffective during the
              suppression hearing for failing to inform
              the trial court that his confession was
              involuntary and for failing to introduce
              expert testimony.

        3.    Trial court erred in denying his post-
              sentence motion regarding after-discovered
              evidence.

A.   <u>Relevant Facts and Procedural History</u>

The facts as recited by the Superior Court are as follows.

On June 12, 1997, at 8 p.m., Rebecca Niecgoski parked her 1989 Buick Century in the Waterworks Cinema parking lot in Pittsburgh and attended a movie.  When she returned at 9:55 p.m., the vehicle was gone.  She observed broken glass in the area of the parking lot where her car had been parked and reported the car stolen to Pittsburgh police.

At 10:32 p.m. that night, Pittsburgh police received a call that shots had been fired and a man was injured in the 7500 block of Susquehanna Avenue in the Homewood section of Pittsburgh.  Upon arriving in the area, police found the body of the victim, Roland Cephas, a known gang member of the Homewood CRIPS, lying in a vacant lot.  Cephas had been shot several times in the head and face.  An autopsy revealed that he had been shot by two different weapons, not at close range.

Police investigated the scene that night and the following day, recovering numerous cartridge and shell casings, slugs and bullet fragments.  Testimony at trial revealed that the evidence recovered was consistent with a .44 caliber handgun and a .380 automatic handgun having been fired at the scene.  At approximately the same time police received the call regarding the Cephas shooting, they were also dispatched to a house at 1534 Westmoreland Street in the Lincoln-Lemington section of Pittsburgh, which was approximately .8 miles from Susquehanna Avenue.  When police arrived at the Westmoreland Street address, they discovered Appellant, who advised them that he had been the victim of a drive-by shooting at the intersection of Lincoln and Lemington Avenues.  Police transported Appellant to the hospital for treatment and then proceeded to the intersection to look for evidence and witnesses.  Police found no blood, shell casings or other evidence demonstrating that a shooting had occurred there.

At 2:30 a.m. on June 13, 1997, Pittsburgh police were dispatched to 1348 Missouri Street in Lincoln-Lemington where a vehicle was burning.  A check of the vehicle's license plate revealed that it was the

stolen Niecgoski vehicle.  Police thoroughly searched the vehicle, finding.380 caliber casings and rifle casings inside.

Police first questioned Appellant regarding his shooting on June 13, 1997 while he was hospitalized in UPMC Presbyterian Hospital.    At that time, he maintained that he had been the victim of a drive-by shooting.    When questioned again at police headquarters on June 19, 1997, and confronted with inconsistencies in his original story, however, Appellant confessed his involvement in the Cephas shooting.    After being advised by police more than once of his Miranda rights, Appellant admitted that at approximately 3:30 p.m. on June 12, 1997, he met up with two friends, Kenyetta Cooper and Jason "bird" Gaines, gang members of the Lincoln Avenue CRIPS. Cooper and Gaines told Appellant that they would pay him $50 to steal a car for them to  commit a drive-be shooting of rival gang member, Homewood CRIP Roland Cephas.    Appellant agreed and, armed with a chisel, took a jitney to the Waterworks Mall to steal a car. He stole a vehicle fitting the description of the Niecgoski vehicle and drove it back to Churchland Street, where he picked up Cooper, who was armed with a .380 caliber handgun.    Appellant and Cooper proceeded to Gladden Street, where Gaines was walking in a grassy area while concealing an SKS or AK-47 rifle.    Gaines got into the front passenger seat and handed Appellant a .44 magnum or .357 revolver. Appellant then drove the three around Homewood for a half hour looking for Cephas.    When they finally spotted Cephas, they opened fire.    During the shooting, Appellant accidentally was shot in the neck, apparently  by Cooper, who was sitting in the back seat with the .380 caliber handgun.  Cooper and Gaines then drove Appellant home and then burned the vehicle. Appellant was treated in Presbyterian University Hospital for a gunshot wound to the neck.  Following a short stay and a successful recovery, Appellant was released without having had the bullet surgically removed.    Test results revealed that the bullet had traveled and was lodged in his cheek.

Following Appellant's confession to police, he was charged with first-degree murder, as well as the above referenced offenses.  Prior to trial, Appellant filed  a motion to suppress his confession to police,

alleging that it was not voluntary, that his
interrogation was custodial in nature prior to
receiving his Miranda warnings, and therefore violated
his constitutional rights.   The suppression court
denied the motion and Appellant proceeded to trial on
December 15, 1998 with Attorney Patrick Thomassey
representing him.

On December 16, 1998, Judge O'Brien declared a
mistrial after a detective testified that Appellant
had agreed to undergo a polygraph examination.   At
Appellant's second jury trial before Judge O'Brien
which began on March 17, 1999, he denied his
involvement in the Cephas murder and presented the
original alibi defense that he was shot in a drive-by
shooting at the corner of Lincoln and Lemington. on
March 22, 1999, the jury acquitted Appellant of first-
degree, but convicted him of the remaining charges.
Sentencing was deferred until May 20, 1999 ....

On April 28, 1999, Appellant forwarded to the
trial court through his counsel a wrapped, taped
package containing an object that he claimed was the
bullet that had lodged in his head following his
shooting.   Appellant claimed that the object had
worked its way out of the side of his cheek while he
was in jail.   New counsel then filed a post-trial
motion for a new trial asserting that this after-
discovered evidence entitled him to a new trial.

Judge O'Brien conducted a hearing on February 1
and 2, 2000, during which Appellant testified that he
had been advised by hospital personnel at the time of
the shooting that surgery to have the bullet removed
from his head posed a risk of damage to his facial
nerves and that the bullet eventually would work
itself out of his body naturally.   Therefore,
Appellant testified that he elected not to have the
surgery before trial.   Appellant presented no
testimony or affidavits from medical personnel who had
treated his gunshot wound at the hospital to support
his claim that he had been advised of significant
medical risk of undergoing surgery to remove the
bullet.

Dr. Robert Levine, the ballistic expert who had
testified at Appellant's trial regarding the type of
bullets found at the crime scene and within the

4

victim, Cephas, testified at the post-trial hearing that he had examined the bullet given to Attorney Thomassey by Appellant that allegedly had emerged from his cheek.  Levine stated that the bullet was a .40 caliber S & W jacketed bullet, a different size than the casings found at the scene.  He further stated however, that several bullet fragments found at the scene were not traceable to any particular caliber of weapon.

On cross-examination during the hearing, Dr. Levine testified that it is not unusual for a bullet removed from person's body that has been lodged there for a period of time to have calcium or mineral deposits on its surface.  He stated that the bullet that allegedly worked its way out of Appellant's cheek had no such deposits despite having been allegedly inside of Appellant's body for nearly two years.  Dr. Levine further testified that he had examined x-rays taken of Appellant's face taken while Appellant was in the hospital on June 13, 1997 and determined that the bullet that was lodged there was most consistent in size and shape with a .380 caliber bullet and not the .40 caliber bullet that Appellant produced from prison after trial.

. . . . . . . . . . . . . . . . .

At the close of the hearing, Judge O'Brien denied Appellant's motion for a new trial, stating on the record his belief that Appellant had failed to satisfy all necessary elements of proof required to establish that he was entitled to a new trial.

Sup. Ct. Op., 5/18/01, at pp. 1-8 (Commw. Ex. 3.) (doc. no. 8).

On May 18, 2001, the Superior Court of Pennsylvania affirmed the judgment of the Court of Common Pleas in affirming Petitioner's judgment of sentence.  Petitioner filed a Petition for Allowance of Appeal, which was denied by the Supreme Court of Pennsylvania on October 5, 2001.

On October 7, 2002, Petitioner, through appointed counsel, filed an Amended Petition pursuant to the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. Ann. §§ 9541 et. seq. On March 6, 2003, the PCRA Court dismissed Petitioner's PCRA Petition finding that all of the claims had been previously litigated on direct appeal. Petitioner filed a timely Notice of Appeal and on December 12, 2003, the Superior Court affirmed the judgment of the PCRA Court denying him post-conviction relief. On July 27, 2004, the Supreme Court of Pennsylvania denied his Petition for Allowance of Appeal. Petitioner filed his federal petition for writ of habeas corpus in this Court on August 26, 2004.

## B. Exhaustion Requirement

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief. To comply with the exhaustion requirement, a state prisoner first must have fairly presented his constitutional and federal law issues to the state courts through direct appeal, collateral review, state *habeas* proceedings, *mandamus* proceedings, or other available procedures for judicial review. *See, e.g.*, Castille v. Peoples, 489 U.S. 346, 351 (1989); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996); Burkett v. Love, 89 F.3d 135, 137 (3d Cir. 1996). Moreover, a petitioner must

present every claim raised in the federal petition to the state's trial court, intermediate appellate court and highest court before exhaustion will be considered satisfied. Orban v. Vaughn, 123 F.3d 727, 730 (3d Cir. 1997), *cert. denied*, 522 U.S. 1059 (1998). The petitioner has the burden of establishing that exhaustion has been satisfied. Ross v. Petsock, 868 F.2d 639, 643 (3d Cir. 1989); O'Halloran v. Ryan, 835 F.2d 506, 508 (3d Cir. 1987).

It appears that Petitioner has presented the majority of his claims to the trial court through his direct appeal. Moreover, it is clear that Petitioner has not demonstrated that he is entitled to federal habeas corpus relief with respect to any of his claims. Accordingly, this Court will review the Petitioner's claims under the authority granted in 28 U.S.C. § 2254(b)(2), which provides that a federal court may deny a petitioner's claims on the merits notwithstanding a petitioner's failure to comply with the exhaustion requirement. *See* 28 U.S.C. § 2254(b)(2) (as amended by The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 142 Cong. Rec. H3305-01 (1996).[1]

---

1. The Court notes that counsel for Respondent asserts herein, and in many other Answers to Petitions filed in this Court, that the PCRA Court's determination that Petitioner's claims were "previously litigated" precludes this Court's review under the procedural default doctrine. This Court suggests that counsel review the procedural default doctrine and argue its

(continued...)

C. <u>Standard of Review</u>

Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations.   28 U.S.C. § 2254.   Specifically, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence.   28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." <u>Campbell v. Vaughn</u>, 209 F.3d 280, 289 (3d Cir. 2000).   In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly.   *Id.* (citing <u>Marshall v. Lonberger</u>, 459 U.S. 422, 433 (1982)).

A federal court may not issue the writ unless it concludes that the state court's adjudication resulted in a decision that was "contrary to," or an "unreasonable application of," clearly

---

1.   (...continued)
application only where supported by the facts and the law.   In this action, the fact that the PCRA court held Petitioner's claims "previously litigated" means that he exhausted his claims in the state courts and that they were adjudicated on the merits.   This is all that is required of him before he is able to attain federal court review.   <u>Story v. Kindt</u>, 26 F.3d 402, 406 n.8 (3d Cir. 1994) (citation omitted).

established federal law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1), Williams v. Taylor, 529 U.S. 362 (2000).

The Supreme Court further clarified that a federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.  Williams, 529 U.S. at 409.  "Under §2254(d)(1)'s unreasonable application clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  These standards apply to mixed questions of fact and law, such as whether trial counsel provided effective assistance of counsel.  Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000), cert. denied, 121 S.Ct. 1621 (2001).  Finally, where the state court fails to adjudicate or address the merits of a petitioner's claims, the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact.  Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).

Petitioner's claims will be reviewed in accordance with the standard set forth above.

D. <u>Involuntariness of Confession</u>

Petitioner asserts that his confession should have been suppressed because it was involuntary. There are two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment. <u>Dickerson v. United States</u>, 530 U.S. 428, 433 (2000). In <u>Miranda v. Arizona</u>, 384 U.S. 436, 467 (1966), the Supreme Court determined that custodial police interrogation inherently involved "compelled" testimony for purposes of the Fifth Amendment. To combat this inherent compulsion, the Supreme Court imposed an obligation on the police to follow certain procedures when dealing with persons accused of criminal conduct. These procedures, referred to as "Miranda" warnings, require the police, *prior* to the initiation of questioning, to inform the accused of the right to remain silent, the right to have an attorney present, that the accused is suspected of involvement in criminal activity and that any statement made by the accused may be used by the police as evidence against him. *Id*. at 468-470. The Miranda rule further requires the police to respect an accused's decision to exercise the rights protected by the Miranda warnings and cease interrogation if the accused indicates that he wishes to remain

10

silent or if he states that he wants an attorney. *Id*. at 473-474.

In determining whether a confession was voluntary, a court must determine whether the confession was "the product of an essentially free and unconstrained choice by its maker," that it was "the product of a rational intellect and a free will" and that the appellant's will was not "overborne." United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994) (internal quotations and citations omitted). Courts look to the totality of circumstances to determine whether a confession was voluntary, including: the length of the interrogation; its location; its continuity; the defendant's maturity; physical condition; and mental health. *Id*. (citations omitted). The Court should consider all of these factors to determine whether the circumstances show that the conduct of law enforcement officials was such as to overbear the defendant's will to resist. Rogers v. Richmond, 365 U.S. 534, 544 (1961).

Petitioner claims that his confession to the police on June 19, 1997 was involuntary because: 1) he was taking a potent narcotic at the time he was questioned which affected his ability to make a knowing confession; 2) the interrogation was very lengthy; and 3) he was brought in for questioning under false pretenses. The record reflects that Allegheny County Detectives Richard McDonald and Dale Canofari went to

Petitioner's residence on the morning of June 19, 1998 to question him about the alleged drive-by shooting in which he claimed he was the victim.  When the detectives arrived, they requested that Petitioner  accompany them back to the police station.  Petitioner agreed and telephoned his father that he would be bringing his toddler son over for him to watch.  The detectives drove Petitioner and his son to Petitioner's father's house where they dropped off his son.  When they arrived at the police station, they placed Petitioner in an interrogation room and began questioning him about the drive-by shooting.

Petitioner initially told police he had been shot while crossing the street.  When the detectives told him they could find no evidence of a shooting at the scene, he changed his story and said that he had been shot by Kenyetta Jones after they had done a drive-by shooting in Homewood.  At that point, at 3:37 p.m., the detectives completed a pre-interrogation warning form and advised Petitioner of his Miranda rights. Petitioner told the officers that he understood his rights and would continue to speak to them.  Another hour passed and Petitioner again was advised of his Miranda rights and completed another pre-interrogation form.  At approximately 6:05 p.m.,

Petitioner gave a detained account of events that led up to the shooting of Cephas.[2]

After hearing this evidence, the trial court denied the motion for suppression.  Implicit in the trial court's ruling is the finding that there was no credible evidence of coercion or threats on the part of the authorities and there was no credible evidence that the defendant asked to talk to an attorney prior to giving his statement.  These implicit factual findings are entitled to a presumption of correctness that Petitioner can overcome only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  As Petitioner has not submitted any evidence to overcome the courts' factual determinations, he is not entitled to habeas relief with respect to this claim.

### E. <u>Ineffective Assistance of Counsel</u>

Petitioner's second claim is that his trial counsel was ineffective during the suppression hearing for failing to inform the trial court that his confession was involuntary and for failing to introduce expert testimony that he was on narcotic medication, which influenced his ability to comprehend the nature of the interrogation.  The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance:  1) counsel's

---

2.  *See* Stipulation of tape transcript, state court record, doc. no. 36.

performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984)). To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. Strickland, 466 U.S. at 690. A petitioner who claims that he or she was denied effective assistance of counsel carries the burden of proof. Cronic, 466 U.S. at 658.

The first prong of the Strickland test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." *Id*. at 689. The question is not whether the defense was free from errors of judgement, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. *Id*.

The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Strickland, 466 U.S. at 689. To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694 (emphasis added). A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. Id.

Petitioner claims that his trial counsel was ineffective during the suppression hearing for failing to inform the trial court that his confession was involuntary and for failing to introduce expert testimony that he was on narcotic medication, which influenced his ability to comprehend the nature of the interrogation. The record clearly shows that in the Omnibus Pre-trial motion, Petitioner's counsel clearly sought suppression of the confession on the following basis:

> d.   That the defendant was under the influence of medication at the time of the statement and not aware of it's incriminating nature.

Moreover, Petitioner elected not to testify at the suppression hearing, thus providing no testimony to support his claim that he even was on medication at the time and that it inhibited his ability to comprehend the nature of the interrogation. The officers went through the pre-interrogation

15

form with him, twice, and he responded clearly and coherently to all of their questions. There was no testimony that Petitioner was unable to understand the implications of the officers' questions.

Petitioner further asserts that his trial attorney should have introduced expert testimony to support his claim of incompetence and supports this claim by attaching an affidavit from Lawson Bernstein, M.D. In this affidavit, Dr. Bernstein avers that, following his review of Petitioner's discharge summary from UPMC medical center dated July 3, 1997, various trial transcripts, and the transcript of the confession, it was his professional opinion that Petitioner "lacked the cognitive capacity to make a knowing and voluntary waiver of his rights and to assent to interrogation on the date of his taped confession."

As stated above, Petitioner did not even testify that, on the date of his confession, he was taking any of the medications prescribed for him at his discharge from the hospital. Thus, there was no basis for any expert testimony. More importantly, there simply is no basis to conclude that Petitioner was prejudiced by his counsel's failure to have presented this evidence. In short, Petitioner has not demonstrated any reasonable probability that the trial court would have credited this opinion over the officers' testimony and the detailed

account of the events given by Petitioner during the interrogation.  As such, Petitioner has not shown that he is entitled to federal habeas corpus relief with respect to this claim.

F. Trial Court Error

Petitioner's final claim is that the trial court erred in denying his post-sentence motion regarding the after-discovered evidence of the bullet.  In this regard, the trial court held two days of hearings and concluded that Petitioner did not meet the standards under Pennsylvania law to require a new trial. Petitioner is not entitled to habeas corpus relief with respect to this claim as he has failed to allege the denial of any federal constitutional right.

In this regard, a state prisoner may seek federal habeas corpus relief only if he is in custody in violation of the Constitution or federal law.  Smith v. Phillips, 455 U.S. 209 (1982); Geschwendt v. Ryan, 967 F.2d 877 (3d Cir.), *cert. denied*, 506 U.S. 977 (1992); Zettlemoyer v. Fulcomer, 923 F.2d 284 (3d Cir.), *cert. denied*, 502 U.S. 902 (1991).  Violations of state law or procedural rules alone are not a sufficient basis for providing federal habeas corpus relief.  Engle v. Isaac, 456 U.S. 107, 119 (1982) .  Thus, a writ of habeas corpus is not available when a state prisoner merely alleges that something in the state proceedings was contrary to general

17

notions of fairness or violated some federal procedural right unless the Constitution or other federal law specifically protects against the alleged unfairness or guarantees the procedural right in the state courts.

Moreover, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Herrera v. Collins, 506 U.S. 390, 400 (1993). Federal habeas corpus review is available to ensure that individuals are not imprisoned in violation of the Constitution, not to correct errors of fact. *Id*. Consequently, Petitioner's third claim provides no basis for federal habeas corpus relief.

G. Certificate of Appealability

The Antiterrorism Act included several major reforms to the federal habeas corpus laws. Section 102 of the Antiterrorism Act (28 U.S.C. § 2253(c) (as amended)) codifies standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. Amended Section 2253 provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."

Petitioner has not made any showing that he was denied any of his constitutional rights.   Accordingly, a certificate of appealability should be denied.

III.   <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report.   Any party opposing the objections shall have seven (7) days from the date of service of the objections to respond thereto.   Failure to timely file objections may constitute a waiver of any appellate rights.


<u>/s/Lisa Pupo Lenihan</u>
Lisa Pupo Lenihan
U.S. Magistrate Judge

Dated: March 21, 2006


cc:  Gary L. Lancaster
     United States District Judge

     Kenneth Andre Dade, EA-6297
     SCI Graterford
     P.O. Box 244
     Graterford, PA 19426-0244

19

Rusheen R. Pettit
Assistant District Attorney
Office of the District Attorney
401 Allegheny County Courthouse
Pittsburgh, PA 15219